IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROOZBEH SEIFOLLAHY ASTARAEE** | : | |
| | : | |
| v. | : | **CIVIL ACTION NO. 20-1522** |
| | : | |
| **VILLANOVA UNIVERSITY** | : | |

_____

**McHUGH, J.**                                                  **DECEMBER 18, 2020**

## <u>MEMORANDUM</u>

Plaintiff Roozbeh Astaraee was a doctoral candidate at Villanova until he was dismissed in April 2019.  Plaintiff hails from Iran and alleges that the University unlawfully discriminated against him because of his national origin both in his oral examination process and his dismissal process.  In support of that allegation, he contends that the university violated in its own policies in its handling of his examination and dismissal.  Against that background, Plaintiff brings claims under Title VI, Section 1981, the Pennsylvania Human Relations Act and alleges common law breach of contract.

The University has moved to dismiss.  For the most part, Defendant's motion will be denied.  Plaintiff's plausible allegations of discriminatory statements and actions by the faculty suffice to state claims under Title VI and the Pennsylvania Human Relations Act (PHRA). Defendant argues that Section 1981 does not prohibit national origin discrimination, but the Third Circuit has squarely held otherwise. Finally, with respect to Plaintiff's claims for breach of contract based on policies outlined in the Engineering Department's Ph.D. handbook and the university's dismissal policy, only part of the claim will be dismissed.

## Facts

In this Circuit, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). At this stage, I accept the facts alleged below as true. *Id.*

Plaintiff resides in Pennsylvania and was born in Iran.  Pl. Am. Compl. ¶¶ 6-7, ECF 7.  He began a Ph.D. program in Chemical and Biological Engineering at Villanova in August 2015.  *Id.* ¶ 39.  In accordance with the Ph.D. program, Plaintiff had a faculty advisor and an advising committee consisting of four professors.  *Id.* ¶¶ 22-34; ¶¶ 40-41.

Between Fall of 2018 and Spring of 2019, Plaintiff alleges that the chairperson of Plaintiff's department, Dr. Comolli, began "intervening" in Plaintiff's program, including attempting to change the professors on Plaintiff's advising committee.  *Id.* ¶¶ 44-51. Dr. Comolli is a "white American female." *Id.* ¶ 20.  She was not Plaintiff's advisor and was not a member of his Ph.D. advising committee. *Id.* ¶¶ 40-41.

On April 10, 2019, Plaintiff attended the oral examination of his written dissertation defense before his advising committee and a moderator. *Id.* ¶ 54. Plaintiff was informed immediately after that he did not pass the oral examination, but that he could re-take the examination.  *Id.* ¶ 61.  Villanova policy states that an advising committee "may, at the discretion of the Advisor" allow a student a second opportunity to take the exam.  *Id.*; Handbook, ECF 7-1.

On April 18, 2019, Plaintiff was informed by his Advisor that Dr. Comolli "changed the Advising Committee's decision and would not allow Plaintiff to re-take the oral examination." *Id.* ¶ 62.  Plaintiff asked his Advisor "what Dr. Comolli's problem with Plaintiff [was]" and his Advisor allegedly stated that Dr. Comolli "has the same problem which many people have with Iranian men, since Iranian men think they are higher than women, she has the same attitude towards

you as an Iranian man." *Id.* ¶ 64. Plaintiff spoke with Dr. Comolli on April 18, 2019, and she purportedly stated "we let you to stay in this country enough. It is time for you [to] come back to your country." *Id.* ¶ 65.

That same day, Dr. Comolli contacted Villanova's Office of International Students and asked them to immediately notify the Department of Homeland Security of Plaintiff's dismissal. *Id.* ¶ 66. Dr. Comolli did this prior to Plaintiff actually being dismissed from the program. *Id.* Dr. Comolli is neither responsible for international student visas nor for instructing the Office of International Students to contact DHS. *Id.* ¶ 67.

On April 25, 2019, Dr. Jones, the Senior Associate Dean for Graduate Studies and Research, informed Plaintiff via email that he was dismissed from the Ph.D. program effective April 30, 2019. *Id.* ¶ 71; Email, ECF 7-1. On April 29, 2019, Plaintiff was arrested and charged with criminal trespass for attempting to enter university buildings. *Id.* ¶ 76. Plaintiff contends that he was still enrolled and was legally allowed on campus at this time. *Id.* Plaintiff was eventually able to enroll in a Master's Program at Drexel University, "which has caused [him] to incur significant expenses." *Id.* ¶ 86. Plaintiff seeks reinstatement into the Ph.D. program, an injunction to prevent retaliatory actions, and damages.

## Title VI

Title VI prohibits discrimination "on the ground of race, color, or national origin." 42 U.S.C. § 2000d. Violations of Title VI can be shown with either direct or circumstantial evidence. *See Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 275 (3d Cir. 2014). Additionally, a plaintiff must allege facts demonstrating intentional discrimination. *See Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (stating that Title VI "prohibits only intentional discrimination"); *David v. Neumann*

*Univ.*, 187 F. Supp. 3d 554, 561 (E.D. Pa. 2016).  Plaintiff here plausibly sets forth a basis for his claims.

### 1.  Direct Evidence

Direct evidence is "evidence sufficient to allow the jury to find that the decision makers placed substantial negative reliance on [the plaintiff's national origin] in reaching their decision."  *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002) (internal quotations and citations omitted).  This includes "overt or explicit evidence which directly reflects discriminatory bias by a decision maker."  *Katchur v. Thomas Jefferson Univ.*, 354 F. Supp. 3d 655, 665 (E.D. Pa. 2019) (quoting *Ke v. Drexel Univ.*, No. 11-6708, 2015 WL 5316492, at *12 (E.D. Pa. 2015).  Direct evidence can be based on comments, and when a Plaintiff relies on such comments, "it is vital that the statements relate to the decisional process."  *Id.*

The comments allegedly made by Dr. Comolli that Plaintiff should return to his country would constitute  direct evidence of discrimination on the basis of national origin.  Based on Plaintiff's Complaint, Dr. Comolli was the key decision maker who reversed the advising committee's decision to allow Plaintiff to re-take his oral examination.  She allegedly made these comments in connection with a discussion about why she made this choice.  Plaintiff has therefore alleged direct evidence of discrimination in violation of Title VI.

### 2.  Circumstantial Evidence

Plaintiffs may also show circumstantial evidence under the framework laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green*.  411 U.S. 792, 802 (1973).  In the educational context, a Plaintiff must show that

> (1) [he] is a member of a protected class; (2) [he] suffered an adverse action at the hands of the defendant in pursuit of [his] education; (3) [he] was qualified to continue in [his] pursuit of his education; and (4) [he] was treated differently from similarly situated students who are not members of the protected class.

*Katchur*, 354 F. Supp. at 666 (citations omitted).[1] Defendant argues only that Plaintiff has not properly pled the fourth element and that he has not shown discriminatory intent, as is required for all Title VI claims. *See Sandoval*, 532 U.S. at 280.

### A. Plaintiff Plausibly Alleges he was Treated Different from Similarly Situated Students

Plaintiff has properly pled facts regarding similarly situated students. Further inquiry into whether the students were in fact similarly situated will be fact-intensive and rely on discovery. Defendant's qualms with this element are better resolved through a motion for summary judgment.

Plaintiff included information about ten other Ph.D. students who Plaintiff alleges are similarly situated and were treated differently from Plaintiff. Am. Compl. ¶¶ 87-102. None of these other students were Iranian. *Id.* ¶ 89. Many of these students also failed exams or were dismissed from the Ph.D. program, but were granted the opportunity to re-take exams or to appeal their dismissals. *Id.*

Defendant argues that none of these students are similarly situated, and relies on *Ke*, a case where a medical student alleged discrimination in his dismissal from Drexel. 2015 WL 5316492 (E.D. Pa. Sep. 4, 2015). *Ke*, however, was decided at the summary judgment stage. *Id.* at *2. The court ultimately found that none of the proffered students were similarly situated to the plaintiff but did so after reviewing spreadsheets that included extensive information about each student that had been provided by the defendant during discovery. *Id.* at *20-29.

Defendant also cites *Z.H. ex rel. Berish v. Penn Hills Sch. Dist.*, No. 12-1696, 2013 WL 300753 (W.D. Pa. Jan. 25, 2013), where a Title VI claim was dismissed under Rule 12(b)(6) due to the

---

[1] The Third Circuit has not explicitly extended the *McDonnell Douglas* framework to the educational context. *See Manning v. Temple Univ.*, 157 Fed. Appx. 509, 513 (3d Cir. 2005). Nevertheless, multiple district courts in the Eastern District have applied this framework to educational institutions. *See, e.g. Katchur*, 354 F. Supp. at 665; *Ke*, 2015 WL 5316492, at *12.

plaintiff's failure to plead this element.  There, however, the plaintiff did not plead any facts in his complaint related to other students, but merely stated legal conclusions, such as that "individuals outside of the Student's protected class have been treated differently."  *Id.* at *6.  The court held that such "conclusory allegation[s]" fell short of the pleading standard required.  *Id.; see also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016) ("[A]lthough a reviewing court now affirmatively disregards a pleading's legal conclusions, it must still— as we have already emphasized— assume all remaining factual allegations to be true, construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them.") (citations omitted).  Here, in contrast, Plaintiff  has alleged specific facts about ten students in Villanova's Ph.D. program.

　　A complaint need only "contain sufficient factual allegations to raise reasonable expectation that discovery will reveal the [*McDonnell Douglas*] elements."  *Katchur*, 354 F. Supp. 3d 655.  Plaintiff has met that burden here.  It may be that the students have meaningful differences in their academic histories and were not similarly situated to Plaintiff, but Plaintiff has the right to develop those facts in discovery before facing dismissal on this ground.  *See Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 306 (3d Cir. 2004) (holding "a determination of whether an individual can satisfy the 'similarly situated' requirement triggers a fact-intensive inquiry based on a whole constellation of factors facing that individual employee.");  *Ke*, 2015 WL 5316492 at *20;  *Stabile v. Allegheny Ludlum, LLC*, No. 12-168, 2012 WL 3877611, at *7 (W.D. Pa. Sep. 6, 2012) ("To the extent that there may be other relevant characteristics of the comparators, those characteristics may be developed during discovery and later challenged in a motion for summary judgment.").

**B.  Plaintiff has Plausibly Alleged Discriminatory Intent**

The University argues that to state a Title VI claim, plaintiffs "must plead facts that establish discriminatory intent." Plaintiff responds that proof of discriminatory intent is required only to recover compensatory damages.  Here, Plaintiff seeks equitable relief (being reinstated in the Ph.D. program) in addition to compensatory damages.

Courts are divided as to whether the requirement to plead discriminatory intent applies only to compensatory damages.  I need not reach that issue, because Plaintiff here has alleged facts showing discriminatory intent.   "Intentional discrimination may be shown 'with evidence demonstrating either discriminatory animus or deliberate indifference.'"  *David*, 187 F. Supp. 3d at 561 (citing *SEPTA v. Gilead Scis., Inc.*, 102 F. Supp. 3d 688, 701 (E.D. Pa. 2015).  Plaintiff has alleged discriminatory animus through the direct words spoken by Dr. Comolli—telling Plaintiff to return to his country— and her immediate effort to notify DHS of his status.  Importantly, this is not a disparate impact case; if any discrimination happened here, it was intentional.[2]

<u>**Section 1981**</u>

Section 1981 protects individuals' rights to make and enforce contracts.  42 U.S.C. § 1981. It guarantees that "[a]ll persons . . . shall have the same right in every state and territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."  § 1981(a).

---

[2] In Defendant's Response brief, Defendant argues that "the alleged comment by Dr. Comollli about Mr. Astaraee returning to his *unnamed* country . . . does not on its face show discrimination tied to Mr. Astaraee's academic experience and does not identify Mr. Astaree's nationality at all." Def. Resp. at 4, ECF 14. The comment is tied to Plaintiff's academic experience, as it was made in the context of discussing his dismissal. The rest of the argument does not merit response.

Defendant argues that section 1981 only prohibits discrimination based on race and ethnicity, and that because plaintiff's claim is based on national origin, this claim must be dismissed.

Defendant's argument is based on several district court cases that have attempted to distinguish between race, ethnicity, national origin, and ancestry.  The difficulty with this approach is illustrated by the Supreme Court's decision in *St. Francis College v. Al-Khazraji*, where it analyzed  the legislative history of section 1981, tracing the meaning of "race" from nineteenth century dictionaries to today. 481 U.S. 604, 610-12 (1987);  *see also Rico v. Leftridge-Byrd*, 340 F.3d 178, 183 (3d Cir. 2003) (citing to *St. Francis College* and asking, in the context of *Batson* challenges, "how does one define 'race' when the understanding of 'race' itself has changed over the centuries?").  Recently, the Third Circuit resolved any ambiguity by holding that section 1981 "prohibits employment discrimination on the basis of race *and national origin*." *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 180 (3d Cir. 2020) (emphasis added).  This outcome was not unexpected, given that  the Supreme Court in *St. Francis College* specifically enumerated "ancestry" as a ground of protection under the Act.  481 U.S. at 613.

Section 1981 claims are analyzed under the same *McDonnell Douglas* framework as Title VI claims.  *See Pryor v. N.C.A.A.*, 288 F.3d 548, 569 (3d Cir. 2002).  Plaintiff's allegations under Title VI, coupled with the allegations concerning his contract claim, discussed below, suffice to state a claim.

## PHRA

Claims under the Pennsylvania Human Relations Act (PHRA) are "treated the same as Title VI and § 1981 claims" and the "resolution of [those claims] will be dispositive of" PHRA claims based on the same facts.  *Davis v. Quaker Valley Sch. Dist.*, No. 13-1329, 2016 WL 912297,

at *1 n.2 (W.D. Pa. Mar. 10, 2016) (citing *Pryor*, 288 F.3d at 569 and *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).  Because Plaintiff has adequately stated claims under  Title VI and section 1981, his  claims under the PHRA claim also survive.

### Breach of Contract

**A.  The  University Handbook as a contract**

Under Pennsylvania law, "the relationship between a private educational institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract."  *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. 1999). "The contract" between a private university and a student "is comprised of the written guidelines, policies, and procedures . . . distributed to the student over the course of their enrollment in the institution." *Id.*

Plaintiff identifies several documents creating contractual obligations—the "Handbook of Policies and Procedures: College of Engineering Ph.D. program," the "Qualifying Examinations Guidelines" and the University's "Dismissal Policy." *See* Am. Compl. ¶ 15; ¶ 141; ECF 7-1; ECF 7-2. These documents lay out the procedures for Ph.D. students, and provide written guidelines and policies for students to follow.  Under *Swartley*, this is the embodiment of the contractual relationship between Plaintiff and Defendant.  *Swartley*, 734 A.2d at 919.

**B.  In part, Plaintiff Plausibly Alleges that Defendant Breached the Contract**

Plaintiff argues that Defendant breached these contracts in numerous ways, both related to his oral exam and related to his dismissal.

**i.      Denial of Opportunity to Re-take Oral Examination**

First, related to his oral exam, Plaintiff alleges that Defendant breached the Student Handbook (1) by allowing Dr. Comolli to change the Advising Committee's decision about Plaintiff re-taking

the oral exam, which she did not have authority to do, and (2) by then refusing to allow Plaintiff

to re-take the oral exam. The relevant portion of the handbook states that:

> Based on the evaluation of the written dissertation proposal and the student's
> performance in the oral portion of the examination, the examining committee will
> award the grade of Pass or Fail. If the student receives a grade of Fail, the
> Committee may, at the discretion of the Advisor, grant the student a second
> opportunity to take the Comprehensive Examination. An examination re-take
> should be scheduled no sooner than one month and no later than six months after
> the first attempt. No more than two attempts at this examination will be permitted,
> even if the student transfers to another department within the College. If the student
> receives a grade of Fail, s/he will be excused
> from the program.

Handbook at 16, ECF 7-1.  Plaintiff argues that only his Advisor and advising committee had the

discretion to grant or deny a student the opportunity to re-take his oral exam.  By allowing Dr.

Comolli, and not Plaintiff's advisor, to make this decision, Plaintiff argues that Defendant violated

the handbook.

Based on the plain language of the Handbook, it seems that discretion is vested in the Advisor,

and Plaintiff has plausibly alleged a breach of contract.  It may in fact prove to be the case that as

chairperson of the department, Dr. Comolli was entitled to override the Advisor's decisions.  But

at the motion to dismiss stage, the claim  survives.

### ii.      Denial of Opportunity to Appeal Dismissal

Second, Defendant allegedly breached the contract by (1) denying Plaintiff the right to appeal

his dismissal.  *See* Am. Compl. ¶ 142.  The Academic Dismissal Policy for Villanova reads:

> A student who has not met the academic standards of a college . . . will be dismissed
> from the college. The college dean will inform that student of the dismissal as soon
> as possible. Typically the student will be allowed to appeal that dismissal to the
> dean of the college. There is no additional process of appeal beyond the college
> dean. In some cases (e.g., when the student has had previous warnings or been on
> probation), the student may, at the determination of the college, be dismissed
> without right of appeal.

Am. Compl. ¶ 14.  Plaintiff essentially argues that because he had no previous warnings and had

not been on probation, he had the right to appeal his dismissal.  Defendant responds  that the policy

qualifies the right of appeal with "typically" and specifically contemplates situations where a

student cannot appeal.  Defendant also argues that the listing of examples in the parenthetical is

not mean to be exhaustive, and students can be denied the opportunity to appeal for reasons beyond

that list.

Based on the plain reading of the Policy, Defendant is correct.  Students' right to appeal is

clearly couched in qualifying language, and the fact that the parenthetical begins with "e.g." shows

that it is not meant to be exhaustive.  To the extent that Plaintiff feels his denial of the right to

appeal was driven by discriminatory reasons, he can rely on the Title VI, Section 1981, and PHRA

claims.  But this part of Plaintiff's breach of contract claim will be dismissed.

### iii.     Punishment of Plaintiff for remaining on campus after dismissal

Finally, Defendant allegedly breached the contract by having Plaintiff arrested for being on

campus April 29, 2019, when he was still legally allowed to be there.  *See* Am Compl. ¶ 142.

Villanova's Dismissal Policy provides:

> Once a student has been dismissed from the college without right of appeal or once
> the appeal process has been exhausted, the student may not enroll in additional
> credit-bearing classes at Villanova, and may not remain in a University Residence
> Hall. A student who is dismissed from a college is dismissed from the University
> effective with the sending of the college dismissal letter.

Am. Compl. ¶ 15.  Plaintiff's dismissal date was April 30, 2019.  *See* Email, ECF 7-1 at 84.  The

letter states that after April 30, Plaintiff would "no longer be allowed on the campus of Villanova

University or in any building on campus including those of the College."  *Id.*

Although the issue is a close one, the Dismissal Policy cited above can qualify as  a

contract.  At a minimum, the email sent to Plaintiff certainly implied  that he was allowed to stay

on campus until April 30. Without a more extensive factual context, I cannot conclude that the

claim lacks merit as a matter of law.

An order follows consistent with the analysis set forth above.

      /s/ Gerald Austin McHugh
United States District Judge